**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

BRIAN S. MUNGER,

                              Plaintiff,                        No. 9:16-CV-728
                                                               (BKS/CFH)
              v.


DR. GERALD CAHILL AND
NURSE WHITE,

                              Defendants.
_____

**APPEARANCES:**                           **OF COUNSEL:**

Brian S. Munger
16-R-3234
Wyoming Correctional Facility
P.O. Box 501
Attica, New York 14011
Plaintiff pro se

Attorney General for the                   HELENA O. PEDERSON, ESQ.
   State of New York                       Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff pro se Brian S. Munger ("plaintiff"), an inmate who was, at all relevant times,

in the custody of the New York Department of Corrections and Community Supervision

("DOCCS") brings this action pursuant to 42 U.S.C. § 1983, alleging that Doctor ("Dr.")

_____

        [1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to
28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

Gerald Cahill and Nurse White – who, at all relevant times, were employed at Franklin Correctional Facility ("Franklin") – violated his constitutional rights under First and Eighth Amendments. <u>See</u> Dkt. No. 1 ("Compl."). Presently pending before the Court are plaintiff's and defendants' Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. Nos. 89, 93. Plaintiff opposed defendants' motion, and defendants filed a reply. Dkt. Nos. 98, 102. For the following reasons, it is recommended that plaintiff's motion be denied and defendants' motion be granted.

## I. Plaintiff's Motion for Summary Judgment

On November 20, 2017, plaintiff filed a Motion for Summary Judgment. Dkt. No. 93. On November 22, 2017, the undersigned issued a Text Order reminding plaintiff that, pursuant to N.D.N.Y. Local Rule 7.1(a)(3), a summary judgment motion must contain: (1) a memorandum of law; (2) an affidavit, which shall not contain legal arguments, but must contain factual and procedural background as appropriate; and (3) a statement of material facts. Dkt. No. 94. The undersigned noted that plaintiff filed an incomplete motion as he did not include a memorandum of law. <u>Id.</u> The undersigned instructed plaintiff to file a memorandum of law on or before December 22, 2017. <u>Id.</u> The undersigned also informed plaintiff that if he failed to file a memorandum of law on or before December 22, 2017, his motion would be denied. <u>Id.</u> Plaintiff did not file a memorandum of law on or before December 22, 2017.

On February 12, 2018, plaintiff filed a letter motion requesting permission to file a "Reply Memorandum in Support of Plaintiff's Motion and Reply to Defendants[']

2

Memorandum of Law." Dkt. No. 105. On February 16, 2018, the undersigned issued a Text Order denying plaintiff's letter motion as "the deadline set in this Court's Text Order, Dkt. No. 94, has expired." Dkt. No. 106. On February 22, 2018, plaintiff attempted to file a document in further support of his motion for summary judgment. Dkt. No. 107. On February 28, 2018, the undersigned issued a Text Order noting that plaintiff's submission may have crossed in the mail with the undersigned's February 16, 2018 Text Order, and again denied plaintiff's request to further supplement his summary judgment motion. Dkt. No. 108. The undersigned ordered the submission (Dkt. No. 107) stricken from the record. Id.

Thus, as plaintiff failed to file a memorandum of law in support of his motion for summary judgment on or before the December 22, 2017 deadline set forth in the undersigned's November 22, 2017 Text Order, it is recommended that plaintiff's motion be denied.

## II. Background

### A. Plaintiff's Recitation of the Facts

Plaintiff is certified disabled, and "suffers from Chronic Degenerative Disc Disease with Severe Pain, 24/7 for life among numerous other ailments[.]" Compl. at 3. On or about January 9, 2013, Dr. Cahill "[a]bruptly discontinued plaintiff[']s [p]ain [m]edication cold turkey, allowing [p]laintiff to suffer extended withdrawls [sic] and a very extended length (7 months) of seriously hightened [sic] pain and suffering[.]" Id. at 4. Plaintiff had been prescribed this particular medication, or similar medications, since 2000, and Dr.

3

Cahill had already authorized, prescribed, and increased the dosage of such medication. Id. On January 11, 2013, plaintiff met with Dr. Cahill, who stated that he discontinued plaintiff's medication because "they told me you were F—ing selling them." Id. at 9.

Plaintiff alleges that several weeks prior to the "sudden discontinuance of [his] medication," Nurse White threatened plaintiff that she would have Dr. Cahill cancel his medication because plaintiff "was faking and did not need his pain medication." Compl. at 4-5. Plaintiff filed two complaints and grievances regarding Nurse White's behavior, and complained directly to the non-party Deputy Superintendent of Administration. Id. at 5.

## B. Defendants' Recitation of the Facts

In support of their motion, defendants filed a Statement of Material Facts.[2] Plaintiff transferred to Franklin on September 10, 2012. Dkt. No. 89-3 ¶ 40. The next day, plaintiff

---

[2] Local Rule 7.1(a)(3) states:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

met with Dr. Cahill for an initial examination.  Id. ¶ 43.  Based on plaintiff's complaints of pain and history of opiate treatment, Dr. Cahill continued plaintiff's prescription for MS Contin 30mg twice per day, until October 10, 2012.  Id. ¶ 44.  MS Contin is the brand name for controlled-release morphine, an opioid pain reliever used for the treatment of moderate to severe pain.  Id. ¶ 23.  Because it is controlled-release medication, MS Contin cannot be crushed or dissolved in water as doing so may cause rapid release and absorption of a potentially fatal dose of morphine.  Id. ¶ 24.  Moreover, it is a 1:1 medication, and each dosage must be personally administered by a medical staff member.  Id. ¶ 25.  At the September 11, 2012 appointment, Dr. Cahill also continued plaintiff's prescriptions for Advair, Albuterol, Prilosex, and naproxen.  Id. ¶ 45.

On October 4, 2012, plaintiff attended sick call and complained of chronic back pain. Dkt. No. 89-3 ¶ 46.  Plaintiff informed the nurses that because he had undergone multiple back surgeries and had multiple epidurals, he felt as though the current dosage of MS Contin was not controlling his pain.  Id. ¶ 47.  Plaintiff informed the nurses that he had previously taken 60mg of OxyContin twice per day for his back pain.  Id.  On October 9, 2012, Dr. Cahill wrote plaintiff a one-month prescription for MS Contin 30mg twice per day, to run from October 11, 2012 to November 11, 2012.  Id. ¶ 48.  On October 12, 2012, plaintiff met with Dr. Cahill, who noted that plaintiff presented with chronic back pain, reported that he had a history of severe pain, and stated that he had undergone multiple surgeries and received epidurals to treat his back problems.  Id. ¶¶ 49, 50.  Thus, Dr. Cahill increased plaintiff's MS Contin dosage to 60mg twice per day, and prescribed gabapentin 600mg twice per day.  Id. ¶ 51.  Both prescriptions expired November 12, 2012.  Id. ¶ 52.

On October 14, 2012, Dr. Cahill discontinued plaintiff's gabapentin prescription after plaintiff reported that it was not helping his pain.  Id. ¶ 53.  Dr. Cahill renewed plaintiff's MS Contin prescription on November 6, 2012 and December 9, 2012.  Id. ¶¶ 54, 55.  The December 9, 2012 renewal expired on January 14, 2013.  Id. ¶ 55.  Dr. Cahill also ordered an x-ray of plaintiff's spine based on plaintiff's previous complaints of pain and self-reported history of back issues.  Id. ¶ 56.  As of December 9, 2012, Franklin's medical department did not have any documentation of plaintiff's back surgery, epidurals, or other treatment he claimed he received from private doctors prior to his incarceration.  Id. ¶ 57.

On January 9, 2013, an unnamed inmate reported to Nurse White that plaintiff had been selling his MS Contin in his dorm.  Dkt. No. 89-3 ¶ 58.  Nurse White informed Dr. Cahill of the inmate's report that plaintiff was "cheeking"[3] his medication and selling it in his dorm.  Id. ¶ 59.  That same day, pursuant to the report that plaintiff had misused his narcotic medication, Dr. Cahill discontinued plaintiff's MS Contin prescription until he was able to review plaintiff's x-ray results and see him for a follow-up appointment.  Id. ¶ 63. Plaintiff continued to have access to his self-carry[4] non-narcotic pain prescriptions such as Motrin, Tylenol, naproxen, and Ibuprofen.  Id. ¶ 67.  It was not Dr. Cahill's responsibility to personally investigate the inmate's report of plaintiff selling medication, and, on January 9, 2013, Dr. Cahill was unaware if security staff had conducted an investigation into such allegations.  Id. ¶¶ 69, 71.

---

[3] An inmate "cheeks" his or her medication when he or she attempts to hide the medication under his or her tongue or in his or her cheek.  Dkt. No. 89-3 ¶ 21.  An inmate cheeks medication to sell, barter, or share it in the dorms, or to hoard in an attempt to get high.  Id.

[4] Self-carry medications are carried on an inmate's person, and are taken at the inmate's discretion.  Dkt. No. 89-3 ¶ 17.

On January 10, 2013, an x-ray of plaintiff's spine was taken.  Dkt. No. 89-3 ¶ 73.

The next day, plaintiff met with Dr. Cahill, who noted that plaintiff complained of

congestion.  Id. ¶¶ 74, 75.  Dr. Cahill noted that plaintiff did not exhibit signs of withdrawal

from MS Contin.   Id. ¶ 76.  Withdrawal symptoms from such narcotic medication occur

within 48-72 hours of discontinuation, and are overt and easily observable.  Id. ¶ 77.

These symptoms include perspiration, tremors, restlessness, irritability, chills with

goosebumps, tachycardia (rapid heart rate), and high blood pressure.  Id. ¶ 77.  During the

January 11, 2013 appointment, Dr. Cahill did not observe that plaintiff exhibited these

symptoms, and found that he was ambulating without issue.  Id. ¶ 78.  Thus, Dr. Cahill

found it unnecessary to reinstate plaintiff's MS Contin prescription at that time.  Id. ¶ 79.

Dr. Cahill scheduled plaintiff's follow-up appointment for June 21, 2013.  Id. ¶ 80.  Dr.

Cahill determined that an earlier follow-up appointment was not needed because "chronic

back pain is not an emergent condition and [p]laintiff's apparent misuse of MS Contin

demonstrated that he may not have needed it."  Id. ¶ 81.  If plaintiff experienced further

back pain prior to the June 21, 2013 appointment, he could have utilized emergency sick

call to request treatment.  Id. ¶ 82.

Plaintiff testified that he experienced withdrawal symptoms after his January 11,

2013 appointment, including "laying on the floor defecating on [himself in severe pain],

feeling fidgety, and being on pins and needles."  Dkt. No. 89-3 ¶ 83 (internal quotations

omitted).  Plaintiff testified that these symptoms lasted for three to five days.  Id. ¶ 84.  On

January 14, 2013, plaintiff met with Nurse White at sick call for complaints of a cold, cough,

and congestion.  Id. ¶ 85.  Nurse White observed that plaintiff's lungs were clear, and

7

indicated that he was put on an antibiotic for his congestion.  Id. ¶ 86.  Nurse White noted that plaintiff showed no signs or symptoms of detoxification or withdrawals from the discontinuance of his MS Contin, and that he was ambulating without difficulty.  Id. ¶ 87. Nurse White also noted that plaintiff was argumentative and obnoxious during the appointment, and demanded to see a physician to obtain morphine.  Id. ¶ 88.

On January 23, 2013, Dr. Cahill reviewed plaintiff's x-ray results.  Dkt. No. 89-3 ¶ 89.  Plaintiff's x-rays suggested that plaintiff suffered from muscle spasm and degenerative disc disease with oseophyte (i.e., bone spur) formation.  Id. ¶ 90.  The x-rays failed to indicate any acute injury to plaintiff's spine.  Id. ¶ 92.  In Dr. Cahill's professional medical opinion, plaintiff's condition was not severe and did not indicate the continued use of narcotic pain medication.  Id. ¶ 93.  Therefore, Dr. Cahill did not reinstate plaintiff's MS Contin prescription after reviewing the x-ray results.  Id. ¶ 94.

On January 31, 2013, plaintiff attended sick call to discuss his lab work and the results of the January 10, 2013 x-ray.  Dkt. No. 89-3 ¶ 95.  Nurse White determined that no further treatment or referrals were necessary.  Id.  Plaintiff's medical records indicate that during the January 31, 2013 appointment, there were no noted complaints of back pain or difficulty moving, or any other apparent sign of distress.  Id. ¶ 96.  Although Nurse White did not see plaintiff for any sick call appointments after January 31, 2013, plaintiff attended sick call on two other occasions and did not complain of severe back pain, seek additional medication for any such pain, or exhibit outward signs of distress or difficulty ambulating.  Id. ¶¶ 97-99.

On April 2 and 3, 2013, the Franklin medical department received plaintiff's medical

8

records from his private physicians.  Dkt. No. 89-3 ¶ 100.  The records indicated that plaintiff underwent an L5-S1 laminectomy and discectomy with microdissection on January 17, 2002, and received epidural injections on or about 2010.  Id. ¶¶ 102, 103.  The private medical records also indicated that in 2009 and 2010, plaintiff's private physicians noted that he suffered from degenerative disc disease.  Id. ¶ 104.  In Dr. Cahill's professional medical opinion, narcotic pain medication is generally not prescribed for chronic back pain resulting from mild to moderate degenerative disc disease; rather, NSAIDS, exercise, and physical therapy are the recommended forms of treatment.  Id. ¶ 106.

On June 21, 2013, plaintiff attended his follow-up appointment with Dr. Cahill.  Dkt. No. 89-2 ¶ 107.  Plaintiff informed Dr. Cahill that his back pain was, "at best," a seven out of ten (with one being mild pain and ten being severe pain).  Id. ¶ 108.  Plaintiff also indicated that pain radiated down both of his legs, and that his left leg was in more pain than his right leg.  Id.  Given plaintiff's new complaints of severe pain in his back and both of his legs, coupled with his review of plaintiff's private medical records, Dr. Cahill determined it was appropriate to revisit treatment with narcotic pain medication.  Id. ¶ 110.  Therefore, Dr. Cahill issued plaintiff a one-month prescription for MS Contin 60mg twice per day, and a one-year prescription of Neurontin 300mg twice per day.  Id. ¶ 111.  Plaintiff testified that he was not satisfied with the return of his prescription, and requested that his MS Contin prescription be "reinstated back to [his] civilian dosage of three times per day."  Id. ¶¶ 112-13.  Plaintiff further testified that even when taking MS Contin, he continued to feel pain and will "always feel the pain."  Id. ¶ 114.  Dr. Cahill continued to renew plaintiff's one-month prescriptions of MS Contin until plaintiff was released from DOCCS custody in

January 2014.  Id. ¶ 115.  From January 2013 through June 28, 2013, Nurse White did not dispense any medications to plaintiff because plaintiff's medication runs were outside of her normal work schedule.  Id. ¶ 117.  On June 29 and June 30, 2013, Nurse White dispensed MS Contin and Neurotonin to plaintiff during the 6:00 A.M. medication runs.  Id. ¶ 118.  To the extent that Nurse White dispensed medication to plaintiff, she provided him with prescribed medication according to Dr. Cahill's orders and DOCCS policy.  Id. ¶ 119.

### III. Discussion

#### A. Legal Standards

#### 1. Summary Judgment Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion.  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party."  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

11

## 2. N.D.N.Y Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts.  See N.D.N.Y. L.R.  7.1(a)(3).  "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue."  Id.  The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs."  Id.  "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  Id. (emphasis omitted).

Defendants argue that plaintiff's claims should be dismissed because his opposition papers fail to comply with Local Rule 7.1(a) for the following reasons: (1) plaintiff did not file a proper response to defendants' statement of material facts as he failed to admit or deny each of defendants' assertions, and to the extent that he denied facts, he failed to provide support for such denials; and (2) plaintiff's response exceeds the twenty-five page limit.  See Dkt. No. 102 ("Def. Reply") at 3-4.  The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute."  Prestopnik v. Whelan, 253 F. Supp 2d 369, 371 (N.D.N.Y. 2003) (concluding that the "plaintiff's suggestion that the transcript and videotape of the [incident] be reviewed to identify support for her Statement of Material Facts Not in Dispute does not cure her failure to comply with Rule 7.1(a)(3).").  Although the defendants argue, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit.

N.D.N.Y. L.R.  7.1(a)(3); Def. Reply at 3-4; see subsection III.A. supra.  Accordingly, in deference to plaintiff's pro se status, the Court will independently review the record when evaluating defendants' Motion for Summary Judgment, and "treat plaintiff's opposition as a response to" defendants' Statement of Material Facts.  Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to Plaintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to Defendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of Defendant's Rule 7.1 Statement."); see Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [p]laintiff failed to respond to the statement of material facts filed by [d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective Motions for summary judgment.").  Moreover, in deference to plaintiff's status, the undersigned will accept plaintiff's memorandum in opposition, but reminds plaintiff to abide by the page limits set forth in the Local Rules.

## B. Exhaustion

Defendants contend that plaintiff failed to exhaust his administrative remedies with respect to his retaliation claim against Nurse White.  See Dkt. No. 89-1 ("Def. Mem. of Law") at 5-7.  While incarcerated at Franklin, plaintiff appealed eight grievances to CORC.  Dkt. No. 89-3 ¶ 141.  Of those eight grievances, two are relevant to the claims at issue: grievances FKN-10033-13 and FKN-10071-13.  Id. ¶ 142.  On January 15, 2013, plaintiff

filed a grievance (FKN-10033-13) alleging that he had been discriminated against and/or harassed by medical staff due to his disability and "medical conditions." Id. ¶ 143. Plaintiff seems to suggest that the alleged discrimination or harassment lead to the discontinuance of his back pain medication on January 9, 2013. Id. He also claims that medical staff suspected him of "cheeking" and selling his medication in the facility. Id. The Superintendent denied this grievance, plaintiff appealed to CORC. Id. ¶ 145. CORC "unanimously accepted in part" plaintiff's grievance "only to the extent that [they] uphold[ ] the determination of the Superintendent for the reasons stated." Id. ¶ 146.

On February 20, 2013, plaintiff filed a grievance (FKN-10071-13) alleging that medical staff had failed to return his back medication, and that he had not been treated for withdrawal symptoms related to the discontinuation of that medication. Dkt. No. 89-3 ¶ 147. The Superintendent denied grievance FKN-10071-13, and plaintiff appealed to CORC. Id. ¶ 148. CORC "unanimously accepted in part plaintiff's grievance "only to the extent that [they] uph[e]ld[ ] the determination of the Superintendent for the reasons stated." Id. ¶ 149. CORC noted that Dr. Cahill had discontinued plaintiff's prescription after it was reported that plaintiff had been selling his medication, and that no signs of withdrawal had been indicated. Id.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular

14

episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[5]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative

---

[5] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S. Ct. at 1858-59).

procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?[6]

Defendants contend that plaintiff failed to appeal to CORC any grievance alleging "a claim of harassment by Nurse White . . . occurring prior to January 9, 2013, or a claim of retaliation by Nurse White . . . occurring on January 9, 2013 for plaintiff's use of the inmate grievance process."  Def. Mem. of Law at 7.  Defendants argue none of plaintiff's grievances "address [p]laintiff's claim that medical staff used false information to cause the discontinuation of his narcotic back pain medication on January 9, 2013, in order to

---

[6] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1).  An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1).  If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii).  If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1).  If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii).  CORC must review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).  Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

retaliate against him for previously filing grievances against medical staff." Id.  In opposition, plaintiff claims that his grievances referencing "harassment" and "discrimination" "clearly show[ ]" his exhaustion of administrative remedies.  Dkt. No. 98 ("Pl. Opp.") at 21.

The record demonstrates that plaintiff successfully completed the grievance process in relation to grievances FKN-10033-13 and FKN-10071-13.  See Dkt. No. 89-5.  However, the parties dispute whether these grievances encompass plaintiff's retaliation claim against Nurse White.  The undersigned finds they do not.  DOCCS Assistant Director of the IGP Rachael Seguin declared that CORC records do not show that plaintiff grieved any claim of medical staff harassment occurring prior to January 9, 2013 or medical staff retaliation occurring on or about January 9, 2013 regarding plaintiff's use of the grievance process. Dkt. No. 89-11 ("Seguin Decl.") ¶ 16.  The material contained in the grievance packet for FKN-10033-13 does not mention allegations of retaliatory conduct by Nurse White.  See Dkt. No. 89-5 at 3-35.  Similarly, plaintiff does not reference Nurse White or any alleged retaliatory conduct in grievance FKN-10071-13.  See id. at 39-41.  Plaintiff first mentions Nurse White in his "Appeal to Superintendent," wherein he alleges that Nurse White is an "abusive nurse" who made several comments to him regarding his alleged selling of medication, and "sabotag[ed] [his] right to [adequate] medical care."  Id. at 44-45.

In New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending corrections officer. See Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009).  "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' . . . and the complaint form

does not instruct the inmate to name the officials allegedly responsible for misconduct." Id. (internal citations omitted).  Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." Id.  However, the grievance "must place defendants on notice of what, substantively, is claimed in order to permit a proper investigation." Messa v. Woods, No. 9:07-CV-306, 2009 WL 3076120, at *6 (N.D.N.Y. Sept. 23, 2009) (citing Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004)).  Although plaintiff references Nurse White in his appeal statement, grievance FKN-10071-13 centers on Dr. Cahill's alleged deliberate indifference to plaintiff's serious medical needs.  See Dkt. No. 89-5 at 42-51.  The investigation into grievance FKN-10071-13 did not address alleged retaliatory conduct —  or any conduct at all — by Nurse White, see id. at 52, and CORC's determination plainly states, "[w]ith respect to the grievant's appeal, CORC asserts that all relevant information must be presented at the time of filing in order for a proper investigation to be conducted at the facility level." Id. at 36.  Thus, the undersigned finds that grievance FKN-10071-13 failed to put defendants on notice of a retaliation claim against Nurse White and allow a proper investigation as to that claim.  See Messa, 2009 WL 3076120, at *6 (granting the defendants' motion for summary judgment on the basis of exhaustion where the plaintiff's grievance failed to put the defendants' on notice of claims against them); cf. Cole v. New York State Dep't. of Corr. and Comm. Superv., No. 9:14-CV-0539 (BKS/DEP), 2016 WL 5394752, at *9 (N.D.N.Y. Aug. 25, 2016) (denying the defendants' motion for summary judgment on the basis of exhaustion where, although he was not named in the grievance, the defendant at issue submitted a written statement as part of the investigation into the incident).

To the extent that plaintiff proffers correspondence to "Dep. Foster," the Superintendent, and other DOCCS officials regarding Nurse White's alleged conduct, this informal correspondence does not constitute proper exhaustion. See Dkt. No. 98-1 at 10-15, 36-38, 48-49.   It is well-established in the Second Circuit that any informal resolution or relief outside of the administrative procedures does not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007); Day v. Chaplin, 354 F. App'x 472, 474 (2d Cir. 2009) (summary order) (noting that informal letters sent to prison officials "do not conform to the proper administrative remedy procedures.").   Thus, because these letters were sent to officials outside the grievance chain of command, they do not satisfy the exhaustion requirement.   Insofar as these letters may have been considered in conjunction with either grievance FKN-10033-13 or FKN-10071-13, the undersigned finds that this still does not constitute exhaustion of plaintiff's retaliation claim because there is no indication that Nurse White was involved in the investigation of those grievances.  See Messa, 2009 WL 3076120, at *6.

Therefore, as both grievances FKN-10033-13 and FKN-10071-13 fail to reference plaintiff's retaliation claim against Nurse White, it is recommended that defendants' motion be granted.

## C. Eighth Amendment
## Deliberate Indifference to Serious Medical Needs

Defendants contend that plaintiff cannot establish a deliberate indifference claim against Dr. Cahill and Nurse White as "there is no evidence in the record to suggest that

either [d]efendant acted with deliberate indifference to any of [p]laintiff's objectively serious medical needs." Def. Mem. of Law at 7. Plaintiff alleges that Dr. Cahill and Nurse White violated his Eighth Amendment rights by "providing him [ ] with inadequate medical care, denial of [legitimately] prescribed medication[,] and deliberate indifference to [his] medical needs." Compl. at 10. Plaintiff also contends that Dr. Cahill and Nurse White "exhibit[ed] 'wanton disregard' for [his] pain and suffering[ ] by canceling [p]laintiff's [legitimately] prescribed pain medication without prescribing any alternatively remedy, causing extreme discomfort and pain[.]" Id.

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain." U.S. CONST. amend. VIII; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). The deliberate indifference standard consists of both an objective and subjective component. See Hathaway, 37 F.3d at 66. The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." Id. The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

## 1. Objective Component

For an inmate to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury. See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006)). First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). "Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." Jones v. Westchester Cnty. Dep't of Corrs., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). However, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or likely will cause the prisoner." Id.

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious.

> Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

Salahuddin, 467 F.3d at 280 (internal citation and quotation marks omitted).

The undersigned will first assess whether plaintiff was actually deprived of adequate medical care. Kucharczyk, 95 F. Supp. 3d at 537. As plaintiff alleges a delay in ongoing treatment, in assessing the seriousness of plaintiff's medical condition, the Court must focus on the challenged delay, rather than the underlying medical condition itself. Salahuddin, 467 F.3d at 280. Plaintiff contends that because of the discontinuation of MS-Contin and the approximately five month interruption in treatment, he suffered "extreme pain" and withdrawal symptoms. See Compl. at 10; Pl. Opp. 36-102. Plaintiff testified that he "laid on the floor defecating on [himself] in severe pain," felt "fidgety" like he was on "pins and needles," and felt like he could not function normally. Dkt. No. 89-7 ("Pl. Dep.") at 40, 109.

Dr. Cahill declared that "[w]ithdrawal symptoms from a narcotic medication such as MS Contin peak within 48-72 hours of discontinuation and are overt and easily observable; they include excessive perspiration, tremors, restlessness, irritability, chills with

22

goosebumps, tachycardia (rapid heart rate), and high blood pressure." Cahill Decl. ¶ 28. Dr. Cahill further declared that he met with plaintiff for an appointment on January 11, 2013, and that plaintiff failed to "present with any of these symptoms, was moving and ambulating without issue, and was in no apparent distress." Id. Indeed, plaintiff's medical records for January 11, 2013 indicate that Dr. Cahill treated plaintiff for nasal congestion with over-the-counter medication. Dkt. No. 90 ("Pl. Med. Rec.") at 77. Although plaintiff denied selling medication in the dorms, and stated that he provided a urine test as proof of his compliance, no mention is made to the discontinuation of the medication or whether plaintiff exhibited withdrawal symptoms. See id.

Nurse Cahill declared that she saw plaintiff for sick call appointments on January 14, 2013 and January 31, 2013. Dkt. No. 89-10 ("White Decl.") ¶¶ 25, 26. Plaintiff's medical records indicate that on January 14, 2013, plaintiff complained of a cold, cough, and congestion, but that his lungs were clear. Pl. Med. Rec. at 77. Nurse White noted that plaintiff showed no symptoms "of detox from MS being stopped. Ambulating and moving" without any problems. Id. Nurse White further noted that plaintiff was "argumentative," "obnoxious," and demanded a follow-up appointment with a doctor for morphine. Id.; White Decl. ¶ 25. On January 31, 2013, Nurse White and plaintiff discussed his lab work and the January 10, 2013 x-ray of his spine. See id.; White Decl. ¶ 26. The medical records do not indicate that plaintiff complained of back pain or discomfort or difficulty moving or exhibited any other signs of distress. White Decl. ¶ 26. Plaintiff attended sick call on two other occasions, and the medicals staff did not note that plaintiff suffered from withdrawal symptoms or any complaints of pain. See Pl. Med. Rec. at 76. Thus, the record

23

demonstrates that Dr. Cahill and Nurse White's statements are consistent with plaintiff's medical records, which establish that plaintiff did not exhibit any withdrawal symptoms during his medical and sick call appointments or complain of any such symptoms during those appointments.

In opposition, plaintiff notes that his January 11, 2013 appointment with Dr. Cahill took place approximately thirty-six hours after the discontinuation of his medication, and, therefore, suggests that his withdrawal symptoms may not yet have manifested as it was not within the "48-72 hour[ ]" time period Dr. Cahill stated.  Pl. Opp. at 37; see Cahill Decl. ¶ 28.  Plaintiff alleges that he informed Dr. Cahill at that appointment that he was "already starting to feel the effects of [withdrawal]," and that "the [withdrawal] kicked in" after he met with Dr. Cahill.  Pl. Opp. at 37-38.  Plaintiff also contends that at the January 14, 2013 and January 31, 2013 sick call appointments, Nurse White "would not give [him] time to go over all [his] symptoms of [withdrawal] nor [his] severe pain and need to see Dr. Cahill."  Id. at 40.

Aside from his self-serving allegations, plaintiff has not proffered evidence that (1) severe withdrawal symptoms manifested from January 9, 2013 until June 21, 2013; (2) he informed Dr. Cahill that he was "feeling the effects of [withdrawal]," Pl. Opp. at 37-38; or (3) Nurse White refused to let him explain his withdrawal symptoms and pain. Although plaintiff offers the affidavits of fellow inmates Daniel Knickerbocker and Brian Sweeney in an attempt to corroborate his allegations of a severe withdrawal symptoms, these affidavits are insufficient to defeat a motion for summary judgment.  It is well-settled that "[a]ffidavits submitted in support of or in opposition to the summary judgment motion

24

must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (quoting FED. R. CIV. P. 56(e)).    Moreover, the "requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." Id. (citing Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999)).    As defendants set forth in their reply, neither affidavit establishes the affiants' qualifications for judging whether plaintiff exhibited withdrawal symptoms, see Dkt. No. 98-1 at 6, 8 (describing plaintiff's condition as having "deteriorated severely," that he "might die," and that the affiant "knew exactly that [plaintiff] was in serious trouble and that only was the beginning of the [withdrawals] for him."), or that these symptoms were in fact associated with withdrawal and not symptoms of the cold, cough, and congestion indicated in plaintiff's medical records or the flu. See Pl. Med. Rec. at 77; Dkt. No. 98-1 at 14-15 (detailing a letter plaintiff sent to Dep. Foster on January 16, 2013 wherein he states "and on top of that I just caught the flu.").    Further, as defendants note, portions of Mr. Sweeney's affidavit also contain hearsay within hearsay — "when I asked him what was wrong he had told me that the medical department . . . had . . . cut him off his prescribed medication," Dkt. No. 98-1 at 8 — which is inadmissable at trial, and, therefore, insufficient to create a disputed issue of fact. See Patterson, 375 F.3d at 219; Def. Reply at 8.    Moreover, even if Mr. Knickerbocker and Mr. Sweeney were qualified to attribute plaintiff's conduct to

25

withdrawal symptoms associated to the discontinuation of his medication, case law suggests that withdrawal symptoms such as sweating, chills, fever, diarrhea, and vomiting are not sufficiently serious for the purpose of an Eighth Amendment analysis.  See Avallone v. Hofman, Nos. 2:06-CV-253, 2:07-CV-1, 2009 WL 2957955, at *5 (D. Vt. Sept. 9, 2009) (citing cases for the proposition that the plaintiff's withdrawal symptoms, including vomiting and diarrhea, from the defendants' alleged failure to prescribe narcotic pain killers do not amount to a sufficiently serious medical condition); Smith v. Rutigliano, No. 06-CV-6320 CJS, 2008 WL 5111314, at *1, 4 (W.D.N.Y. Dec. 3, 2008) (concluding that plaintiff's withdrawal symptoms, which included night sweats, chills, and an upset stomach, did not amount to a sufficiently serious medical condition).  Thus, even if the undersigned were to consider the plaintiff's proffered affidavits, they do not create a genuine issue of material fact precluding summary judgment. See Carey, 923 F.2d at 19.

Moreover, Dr. Cahill declared that throughout the period that plaintiff's MS Contin prescription was discontinued, plaintiff had access to "self-carry non-narcotic medications to treat his pain, such as Motrin, Tylenol, naproxen[,] and ibuprofen" to manage his pain. Cahill Decl. ¶ 37.  DOCCS medical staff also issued plaintiff medical excuse passes when he drafted into the state prison system in August 2012 restricting him from participating in work programs, activities that involved prolonged standing, recreational activities, heavy lifting, and strenuous physical activity "in an effort to alleviate his pain and to avoid exacerbating any pain." Id.; Pl. Med. Rec. at 44-48.  Thus, plaintiff's argument in opposition that he did not have access to other medications or accommodations to help his pain is contradicted by his medical records which establish he had access to self-carry

medications and activity restrictions.  See id.; Pl. Opp. at 63-64.

Finally, Dr. Cahill declared that plaintiff "did not exhibit any adverse long-term effects as a result of the temporary discontinuation of his MS Contin prescription," Cahill Decl. ¶ 42, and there is no indication in the record to support a conclusion that plaintiff suffered from "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66.  Thus, plaintiff has failed to establish that he suffered a sufficiently serious deprivation of medical care.

## 2. Subjective Component

Although plaintiff fails to establish the objective component of the deliberate indifference test, and plaintiff must demonstrate both prongs to state a deliberate indifference claim, see Hathaway, 37 F.3d at 66, for the sake of a complete analysis, the undersigned addresses the subjective component.  A prison official acts with a sufficiently-culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.  "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  Id. (quotation marks omitted).  A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.'" Wright v. Genovese, 684 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing Farmer,

511 U.S. at 844)).    Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." Id. at 154-155 (quoting Salahuddin, 467 F.3d at 281) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." Chance, 143 F.3d at 703.  Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." Randle v. Alexander, 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation omitted).

### a. Dr. Cahill

Plaintiff fails to establish that Dr. Cahill knew of and disregarded an "excessive risk" to his health under the subjective component.  As set forth in his declaration, Dr. Cahill discontinued plaintiff's MS Contin prescription based on his belief that plaintiff had been misusing the drug,[7] and in an attempt to gain more insight into whether the drug was

---

[7] Plaintiff contends that an inmate accused him of "cheeking" medication in November 2012, and that Franklin security staff determined that the inmate's report was unfounded.  See Pl. Opp. at 85. Neither party has offered evidence regarding any investigation into whether plaintiff misused his medication, but there is some indication that there was no disciplinary report regarding such allegations. See Dkt. No. 89-5 at 25.  Dr. Cahill declared that, although he was not aware of whether security staff conducted an investigation into whether plaintiff misused medication in January 2013, he believed, in his professional medical opinion, that it was appropriate to discontinue plaintiff's prescription "in light of [Nurse White's] report that he was not taking it as prescribed." Cahill Decl. ¶ 26.

medically necessary after reviewing the results of an upcoming x-ray of plaintiff's spine and the medical documentation from his private physicians. Cahill Decl. ¶¶ 23, 24. Plaintiff's medical records for January 9, 2013 indicate that plaintiff's prescription be discontinued "until seen by MD." Pl. Med. Rec. at 78; see Cahill Decl. ¶ 24 ("I ordered the discontinuation of his MS Contin prescription until I was able to review his x-ray results and see him for a follow-up appointment."). During plaintiff's January 11, 2013 appointment, Dr. Cahill did not observe plaintiff exhibiting withdrawal symptoms, and no symptoms associated with the discontinuation of the narcotics medication are noted in his medical record. See Cahill Decl. ¶ 28; Pl. Med. Rec. 77. To the extent that plaintiff contends he informed Dr. Cahill that he was "feeling the effects of [withdrawal]," Pl. Opp. at 37-38, such symptoms were not readily observable to Dr. Cahill. Moreover, it has been held that:

> [e]ven where the doctor allegedly knows that the medication contains addictive attributes and that the patient has been taking it for an extended period of time, the failure by the doctor to predict the patient's . . . withdrawal amounts to nothing more than negligence or malpractice; tortious conduct which is not actionable under § 1983.

Vail v. Lashaway, No. 9:12-CV-1245 (GTS/RFT), 2014 WL 4626490, at *11 (N.D.N.Y. Sept. 15, 2014) (citing Alston v. Bendheim, 672 F. Supp. 2d 378, 386 (S.D.N.Y.2009)). Thus, insofar as plaintiff speculated that he was beginning to experience withdrawal symptoms, Dr. Cahill cannot be found deliberately indifferent to that speculation. See id.

Dr. Cahill's review of plaintiff's January 10, 2013 x-ray results "were suggestive of muscle spasm and degenerative disc disease with oseophyte (i.e., bone spur) formation," which may cause "mild discomfort to short bursts of severe pain[.]" Cahill Decl. ¶ 31. However, the x-ray did not demonstrate any injury to plaintiff's spine, and, in Dr. Cahill's

29

medical opinion, the condition was not severe enough to require the continued use of narcotic pain medication. <u>See id.</u> Dr. Cahill also reviewed plaintiff's medical records from his private physicians, which indicated that plaintiff suffered from degenerative disc disease. <u>See id.</u> ¶ 34. Dr. Cahill characterized degenerative disc disease as a "common condition," and stated that narcotic pain medication is generally not required in cases of mild to moderate degenerative disc disease. <u>Id.</u> ¶ 35. Thus, based on his review of plaintiff's x-ray results and private medical record, as well as his own direct observations of plaintiff during appointments and notations made by nurses during sick call, Dr. Cahill declared that:

> [i]n [his] professional medical opinion, [plaintiff] did not require narcotic pain medication for chronic pack pain resulting from degenerative disc disease between January 2013 and June 2013 because the findings from his January 10, 2013 x-ray were unremarkable and there was no indication that he was in severe pain, or had trouble ambulating due to pain, during Nurse's Sick Call or doctor's appointments.

Cahill Decl. ¶ 37.

Further, on June 21, 2013, Dr. Cahill met with plaintiff for his follow-up appointment, and determined that, based on plaintiff's complaints that his back pain was, "'at best,' a seven out of [ten]," and that pain "radiated down both of his legs," as well as his history of chronic back pain, it was "appropriate to revisit treatment with narcotic pain medication *at that time*." <u>Id.</u> ¶¶ 36, 37 (emphasis added). Thus, as Dr. Cahill sincerely believed that plaintiff did not need narcotic pain medication from January 9, 2013 until June 21, 2013, it cannot be said that Dr. Cahill knew of and disregarded an "excessive risk" to his health. <u>Farmer</u>, 511 U.S. at 837. It was Dr. Cahill's sincere belief that the discontinuation of

30

plaintiff's narcotic pain medication between January 9, 2013 and June 21, 2013 "posed no risk of serious harm" to plaintiff. Wright, 684 F. Supp. 2d at 154. Moreover, Dr. Cahill knew that plaintiff was "never without access to some form of pain control medication." Cahill Decl. ¶ 41. That plaintiff believed his pain required more or different treatment does not render Dr. Cahill's decision to temporarily discontinue that medication an Eighth Amendment violation. See Randle, 960 F. Supp. 2d at 481 ("[A] difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.") (internal citations and quotation marks omitted). Inmates do not have a constitutional right to the treatment of their choice. See Wright, 694 F. Supp. 2d at 155 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) ("[That the plaintiff] preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation.").

To the extent that Dr. Cahill's assessment of plaintiff's need for narcotic pain medication differed from that of plaintiff's previous medical providers, this allegation does not amount to a constitutional violation. See Chance, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted).

Moreover, there is no indication in the record supporting a conclusion that Dr. Cahill intentionally discontinued plaintiff's narcotic pain medication, nor is there any evidence that he discontinued the medication as a form of punishment. See Burroughs v. Petrone, 138 F. Supp. 3d 182, 212 (N.D.N.Y. 2015) ("Although a delay in providing necessary medical

31

care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment[.]") (internal quotation marks and citation omitted). Instead, the record establishes that Dr. Cahill discontinued plaintiff's medication after reports that plaintiff had been misusing the drug, and to determine whether plaintiff's private medical records and x-ray results indicated that narcotic pain medication was necessary.  See Cahill Decl. ¶¶ 23, 24.  As defendants note, plaintiff testified that Dr. Cahill "prescribed my meds, he increased them when I told him.  He was great . . . . [W]henever I saw Dr. Cahill, it was a pleasant conversation.  I mean, I don't know if I should say it[,] but I'm good with Dr. Cahill.  I think he's a great doctor."  Pl. Dep. at 67. Although plaintiff testified that Dr. Cahill "did wrong," id., there is nothing in the record to suggest that Dr. Cahill discontinued plaintiff's narcotic pain medication as a form of punishment.

Even if Dr. Cahill's decisions caused plaintiff unintended harm, negligence[8] is not actionable under section 1983.  See Burroughs, 138 F. Supp. 3d at 211("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); see Daniels v. Williams, 474 U.S. 327 (1986) (concluding that negligence is not a cognizable claim under section 1983); Kucharczyk, 95 F. Supp. 3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference.").  Thus, plaintiff fails to establish that Dr. Cahill knew of and disregarded an "excessive risk" to his health" under the second prong of the

---

[8] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

deliberate indifference test.

Accordingly, it is recommended that defendants' motion, insofar as it relates to a deliberate indifference claim against Dr. Cahill, be granted.

### b. Nurse White

Plaintiff fails to establish that Nurse White knew of and disregarded an "excessive risk" to his health" under the second prong. Farmer, 511 U.S. at 837. In support of their argument, defendants cite to Emerson v. New York State Dep't of Corr. Servs. In Emerson, this Court assessed whether the defendant nurse should be held liable under the Eighth Amendment "for alleged deprivations of [the] plaintiff's pain medication," where she advised the defendant doctor of "unfounded allegations" that plaintiff "had been caught passing morphine tablets to another inmate[.]" Emerson v. New York State Dep't of Corr. Servs., No. 9:08-CV-824 (NAM/ATB), 2011 U.S. Dist. LEXIS 116377, at *20-23 (N.D.N.Y. Sept. 9, 2011), report-recommendation and order adopted, 2011 U.S. Dist. LEXIS 112521 (N.D.N.Y, Sept. 30, 2011). This Court recommended dismissal of the Eighth Amendment claim against the defendant nurse as she "merely passed on to [the defendant doctor] the allegation that plaintiff had been caught giving his morphine to another patient[.]" Id. at *38. Moreover, it held that the Eighth Amendment claims against the defendant nurse "would also be subject to dismissal because, as a nurse, she lacked the authority to override the medical decision of the treating prison physician." Id. Similarly, here, Nurse White informed Dr. Cahill that an inmate had reported that plaintiff was selling MS Contin in his dorm. White Decl. ¶ 20. The record is clear that Dr. Cahill

ordered that plaintiff's prescription be discontinued.  Id. ¶ 24.  Nurse White addressed plaintiff's complaints during sick call appointments to the extent that she had the authority, and the record demonstrates that she, as a Registered Nurse, did not have the authority to either prescribe medication to an inmate, or discontinue that medication.  Id. ¶ 6.

Insofar as plaintiff contends that Nurse White interfered with his MS Contin prescription by informing Dr. Cahill of reports that plaintiff had misused his medication and acted on a "false allegation," see Compl. at 9; Pl. Opp. at 72, Nurse White had a sincere belief that, as a Registered Nurse, "it was [her] responsibility to alert Dr. Cahill to the information [she] received regarding [plaintiff's] noncompliance with medication protocol, so that appropriate action could be taken to protect [plaintiff's] health as well as the safety and security of the facility, its staff and other inmates."  White Decl. ¶ 21.  Moreover, even if Nurse White's decisions caused plaintiff unintended harm, negligence[9] is not actionable under section 1983.  See Burroughs, 138 F. Supp. 3d at 211.  Thus, plaintiff fails to establish that Nurse White knew of and disregarded an "excessive risk" to his health" under the second prong of the deliberate indifference test.

Accordingly, it is recommended that defendants' motion, insofar as it relates to a deliberate indifference claim against Nurse White, be granted.

### D. First Amendment Retaliation

Plaintiff seems to suggest that Nurse White provided false information to Dr. Cahill

---

[9] The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

in retaliation for filing grievances against her.  See Compl. at 11.  Defendants argue that "[t]o the extent [p]laintiff's First Amendment retaliation claim against Nurse White is not dismissed on the basis of his failure to exhaust administrative remedies, this claim must be dismissed because [p]laintiff cannot prove all of its essential elements."  Def. Mem. of Law at 17.   Courts are to "approach  [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'"  See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)).  A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).

"To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  Espinal, 558 F.3d at 128 (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560)).  To demonstrate the adverse action element, a plaintiff must show that the defendant's "'retaliatory conduct . . . would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . . Otherwise, the retaliatory act is simply de minimis, and therefore  outside the ambit of constitutional protection.'"  Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93).  "Types of circumstantial evidence that can

show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (internal quotation marks omitted); see also Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). Although plaintiff contends that Nurse White reported false allegations to Dr. Cahill in retaliation for grievances he filed against her, the record indicates that plaintiff filed his "1st grievance . . . in 2 N.Y.S. prison sentences and 1 federal" on January 10, 2013 alleging that Dr. Cahill discontinued his medication. Dkt. No. 89-5 at 9. IGP Assistant Director Seguin confirmed that of the eight grievances plaintiff filed while housed at Franklin, none were filed prior to January 9, 2013. Seguin Decl. ¶ 12. Thus, it is clear that plaintiff did not file any grievance prior to January 9, 2013, the date he alleges Nurse White

took adverse action against him.

In opposition, plaintiff contends Nurse White's harassment, threats, and retaliation began after he filed "several 'complaints'" prior to January 9, 2013. Although letters and complaints constitute protected speech under the First Amendment, plaintiff has not proffered copies of those complaints dated prior to January 9, 2013, nor has he stated to whom he addressed those complaints or specifically alleged what his complaints were with regard to Nurse White. See Cowart v. Abdel-Razzaq, No. 08-CV-00554F, 2011 WL 890696, at *6 (W.D.N.Y. Mar. 14, 2011) (holding that the plaintiff's written complaints regarding the defendant's conduct "with regard to alleged falsehoods and slanderous statements" made by the defendant constitute protected speech under the First Amendment) (citing Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 152 (2d Cir.2006) (concluding that "complaints, protests, and lawsuits" amount to protected speech under the First Amendment)). The letters plaintiff has provided regarding Nurse White's alleged conduct are dated after January 9, 2013 — the date of the alleged retaliatory action. See Dkt. No. 98-1 at 10-13 (letter dated January 15, 2013), 14-15 (letter dated January 16, 2013), 36-37 (letter dated January 17, 2013), 48-49 (letter dated August 5, 2013). Nurse White declared that she was not aware of any grievances or complaints filed by plaintiff prior to January 9, 2013, and plaintiff fails to offer evidence suggesting otherwise. Thus, plaintiff's retaliation claim must fail as Nurse White's alleged adverse action predates plaintiff's protected speech. See Roseboro, 791 F. Supp. 2d at 368 ("Consequently, this claim fails because Officer Gillespie's conduct cannot be retaliatory since it predated the protected speech."); Williams v. Smith, No. 9:11-CV-0601

(LEK/TWD), 2015 WL 1179339, at *10 (N.D.N.Y. Jan. 26, 2015) ("Adverse actions that predate protected conduct cannot form the basis of a retaliation claim."); Dabney v. Stormer, No. 9:10-CV-0519 (GTS/DEP), 2013 WL 5406626, at *9 (N.D.N.Y. Sept. 25, 2013) (collecting cases for the proposition that a plaintiff may not base his or her retaliation claim on adverse actions that predate the protected speech).

To the extent that plaintiff testified that Nurse White retaliated against him by "calling [him] some of the nastiest names right in front of everybody like she didn't care," and "being very cruel," Pl. Dep. at 63; Dkt. No. 89-8 at 4, verbal harassment or threats, absent injury, is generally insufficient to rise to the level of a constitutional violation. See Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) ("Allegations of threats or verbal harassment, without any injury or damage, do not state a claim under 42 U.S.C. § 1983."). Further, verbal harassment and threats are generally not considered conduct "'that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights.'" Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted).

Accordingly, as plaintiff fails to state a retaliation claim against Nurse White, it is recommended that defendants' motion be granted.


### E. Qualified Immunity

Defendants argue that plaintiff's claims "must be dismissed by operation of the qualified immunity doctrine[.]" Def. Mem. of Law at 20. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as

38

that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See subsection III.B.-D. supra, at 13-38. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F. Supp. 2d at 230. Accordingly, it is recommended that defendants' motion on this ground be granted.

## IV. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that plaintiff's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 93) be **DENIED**; and it is further

**RECOMMENDED**, that defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 89) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[10]

Dated: July 23, 2018
Albany, New York

*Christian F. Hemmel*

Christian F. Hummel
U.S. Magistrate Judge

---

[10] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).